**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

POLICE RETIREMENT SYSTEM OF ST.
LOUIS, individually and on behalf of
all others similarly situated,
*Plaintiff-Appellant*,

v.

INTUITIVE SURGICAL, INC.;
BENJAMIN GONG; ALEKS CUKIC;
JEROME MCNAMARA; MARK J.
RUBASH; GARY GUTHART;
MARSHALL MOHR; LONNIE SMITH,
*Defendants-Appellees*.

No. 12-16430

D.C. No.
5:10-cv-03451-
LHK

OPINION

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted
March 14, 2014—San Francisco, California

Filed July 16, 2014

Before: Jerome Farris, A. Wallace Tashima,
and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Securities Fraud

The panel affirmed the dismissal of a securities fraud action brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Rule 10b-5 by purchasers of the stock of a company that designed, manufactured, and marketed robotic surgical devices.

The complaint alleged that through its executives the company knowingly issued false and misleading statements regarding its growth and financial health, which caused artificial inflation of the share price. The panel held that the company's statements were, in large part, non-actionable forward-looking statements or garden variety corporate optimism. The panel also held that the complaint was deficient in suggesting that the executives made false statements with knowing or reckless disregard for the company's economic circumstances. The panel concluded that the complaint did not meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Ian D. Berg (argued) and Takeo A. Kellar, Abraham, Fruchter & Twersky, LLP, San Diego, California; Atara Hirsch and Mitchell M.Z. Twersky, Abraham, Fruchter, & Twersky, LLP, New York, New York, for Plaintiff-Appellant.

Michael D. Celio (argued), Robert A. Van Nest, and Cody S. Harris, Keker & Van Nest LLP, San Francisco, California, for Defendants-Appellees.

---

**OPINION**

McKEOWN, Circuit Judge:

This case, involving robotic surgical devices, raises the question of how precise public statements of a company's potential growth must be to comply with  the anti-fraud protections of the securities laws.  Intuitive Surgical, Inc. ("Intuitive") is a corporation that designs, manufactures, and markets *da Vinci* Surgical Systems ("Systems"), cutting-edge robotic devices used for minimally invasive surgeries.  The Police Retirement System of St. Louis ("PRS") is a public pension fund that purchased shares of Intuitive stock.

PRS brought a class action suit against Intuitive on behalf of purchasers of Intuitive common stock, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5.  *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.  PRS also named as defendants the following Intuitive executives (collectively, the "individual defendants"): Lonnie M. Smith, the CEO and Chairman of the Board of Directors;

Gary S. Guthart, the President and COO;[1] Jerome J. McNamara, the Executive Vice President of Worldwide Sales and Marketing; Marshall L. Mohr, the Senior Vice President and CFO; Aleks Cukic, the Vice President of Business Development and Strategic Planning; and Benjamin Gong, the Vice President of Finance.

The complaint alleges that through its executives Intuitive knowingly issued false and misleading statements regarding the company's growth and financial health, which caused artificial inflation of the share price throughout the Class Period, from February 1, 2008 to January 7, 2009, resulting in losses to the class members. Despite the nearly six hundred allegations contained in the over three-hundred-page complaint, the company's statements are, in large part, forward-looking statements or garden variety corporate optimism—neither category is actionable under the securities laws. The complaint is also deficient in suggesting that the executives made false statements with knowing or reckless disregard for Intuitive's economic circumstances. Although PRS tries to paint a picture of Intuitive's affirmative misrepresentations, we conclude that after two amendments, the complaint does not meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.

## BACKGROUND AND PROCEDURAL HISTORY

Intuitive sells Systems and instruments for robotic surgeries, specifically *da Vinci* Prostatectomy procedures

---

[1] Guthart served as President and COO during the Class Period. He now serves as CEO and Director.

("*dVP*") and *da Vinci* Hysterectomy procedures ("*dVH*"). The sale of new Systems[2] and instruments ("system placement") and of replacement instruments ("recurring revenue") to hospitals generates Intuitive's revenue. Revenue grew continuously from 1999, when the Systems were first introduced, to 2007. For example, Intuitive share price closed at $87.11 in January 2007 and grew to $353.00 by December 2007.

The landscape changed significantly in the first quarter of 2008 when the share price fell to $280.50. Shortly after Intuitive announced these results, Oppenheimer & Co. released a report ("the Oppenheimer Report"), expressing the view, corroborated by other sources, that Intuitive's first quarter of 2008 share price "was nowhere near enough to sustain [its] valuation" and that system placement was decelerating.

Stock prices and revenues continued to fall, and, by the end of the Class Period, the share price closed at $110.54. Around this time, the Board of Directors adopted a severance plan providing for generous benefits to the individual defendants in the event of a change in control of the company. Ultimately, Intuitive disclosed that "it was unable to sustain system placement growth," and 2008 revenue

---

[2] The Systems are comprised of "a Surgeon's Console, a Patient-Side Cart, a high performance Vision System and proprietary 'wristed' instruments—called *EndoWrist* instruments—and other surgical accessories." Using the Systems, which employ "hardware, software, algorithms, mechanics and optics to translate the surgeon's hand movements on the controls into precise and corresponding real-time micro movements of the *EndoWrist* instruments positioned inside the patient," surgeons "operate while seated at a console and viewing a high resolution, 3-Dimensional (3-D) image of the surgical field."

increased only 46%, meeting the company's guidance of 40% growth, but falling slightly short of its expected 49–50% growth for 2007.

PRS alleges that in the 2007 Annual Report filed with the SEC and in four analyst calls in 2008, Intuitive knowingly or recklessly misrepresented the company's financial situation. The report warned that an economic downturn "may have significant impact on the ability of our customers to secure funding to buy our products or might cause purchasing decisions to be delayed. . . . [, which] may result in decreased revenues and also allow our competitors additional time to develop products that may have a competitive edge, making future sales of our products more difficult."  The analyst calls also contained warnings that certain forward-looking statements might be made and that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties," such that "investors are cautioned not to place undue reliance on such forward-looking statements."

Relying on witness accounts, PRS alleges that the individual defendants "by virtue of their positions with the company, had access to adverse undisclosed information about the company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith."  According to the witnesses, Intuitive's proprietary software tracked each use of the Systems for each procedure down to the types of movements involved, and this information,"was used to track

all aspects of [Intuitive's] business in real-time and to generate reports on [Intuitive's] business operations and business goals." PRS also points to witness accounts that this software was "accessible on-line and thus available at all times" to the individual defendants. One witness described the company's management as "top-down," with the individual defendants "play[ing] very active roles in running the day-to-day operations."

Based on the witness accounts, PRS asserts that the individual defendants knew of or recklessly disregarded the falsity of certain public statements and disclosures because the proprietary software reflected a different situation. Although the individual defendants publicly claimed that the company would remain in a growth position, PRS alleges that the individual defendants knew or should have known that system placement was decreasing because of the economic downturn, market saturation, and sales and service trends, and that this decreased growth was evident from the software-generated reports to which the executives had access.

In addition to alleging false statements, PRS claims that statements about increased revenue were misleading because Intuitive did not disclose known trends, including the facts that revenue increased due to price increases for Systems rather than higher system placement rates; the economic crisis would continue to impact system placement negatively; market saturation was also causing decreased system placement; diminished system placement would impact recurring revenue; and the number of *dVP* procedures, which generate the most revenue per procedure, was decelerating faster than disclosed and would result in decreased system placement that the growth in *dVH* procedures would not

offset. These representations allegedly "misled investors about the sustainability of system placement growth . . . and [r]ecurring revenue growth."

PRS also highlights other allegedly suspicious activity during the Class Period. The already-significant compensation of Intuitive executives spiked. Smith, Guthart, McNamara, and Mohr made lucrative sales of Intuitive stock allegedly based on insider information. Finally, in March 2009, three months following the end of the Class Period, the Board of Directors, led by Smith, authorized a stock buy back, which was privately negotiated with the individual defendants.

After two amendments, the district court dismissed the complaint with prejudice for failure to state a claim under Federal Rules of Civil Procedure 9(b) and (12)(b)(6).

## ANALYSIS

The adoption of the PSLRA in 1995 spurred a growing body of appellate precedent related to pleading requirements in securities suits. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308 (2007); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012). The PSLRA standards, though well known, require careful application in each case, particularly in evaluating dismissal under Federal Rules of Civil Procedure 9(b) and 12(b)(6). *See Tellabs*, 551 U.S. at 313. Rule 10b-5, which implements the anti-fraud provisions of section 10(b) of the Securities Exchange Act, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.  To state a claim for securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, —S. Ct.—, No. 13-317, 2014 WL 2807181, at \*6 (June 23, 2014) (citations omitted).   Only the first and second elements—material misrepresentations or omissions and scienter—are at issue in this appeal.

In our de novo review of the district court's dismissal for failure to state a claim, we accept as true all allegations of material fact and "construe them in the light most favorable to the nonmoving party."   *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A fraud claim must satisfy both the pleading requirements of the PSLRA and the heightened pleading standard of Rule 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see also Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014).  The PSLRA also imposes "more exacting pleading requirements" including, among other things, that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A).  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Although we examine individual allegations in order to benchmark whether they are actionable, we consider the allegations collectively and

examine the complaint as a whole.  *See Tellabs*, 551 U.S. at 322–23.

## I.   Material Misstatements or Omissions

To meet the materiality requirement of Rule 10b-5, the complaint must allege facts sufficient to support the inference that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."   *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted).   The heart of PRS's allegations, which target misstatements made during various analyst calls, are not actionable because they are forward-looking statements covered by the safe harbor provision of the PSLRA or mere corporate puffery.  Nor are the claimed omissions in the 2007 Annual Report actionable because they are not material.

### A.  Safe Harbor for Forward-Looking Statements

The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues."   *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (internal quotation marks omitted).   The safe harbor applies if the forward-looking statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially

from those in the forward-looking statement," or (ii) if it is not identified as a forward-looking statement and not accompanied by cautionary language, unless the statement was "made with actual knowledge . . . that the statement was false or misleading."   15 U.S.C. § 78u-5(c)(1); *see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face.  *See id.* at 1111 ("[An] earnings projection is by definition a forward-looking statement.").  Statements such as "[i]nstrument and accessor[ies] revenues . . . are expected to grow approximately 55% over 2007," "we continue to expect *dVP* procedures to grow approximately 40% . . . .," and "we are now forecasting our system revenue to grow 45–46% over 2007," are illustrative examples of Intuitive's revenue projections.  Contrary to PRS's assertions, the statements are not "misleading as to the then-present effects and circumstances,"of known trends on Intuitive's financial health; they plainly project expectations for future growth. We adopt the district court's analysis regarding these statements.

We also identify three additional statements, beyond those the district court identified, as falling within the safe harbor.[3] As with the other statements, these responses during the analyst calls relate to future economic performance or assumptions underlying those projections:

---

[3] The district court deemed these statements were not actionable because they were not false or misleading and were not made with scienter.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451, 2012 WL 1868874, at *15 (N.D. Cal. May 22, 2012).

• "Gynecology plays a bigger and bigger role each day . . .[G]ynecology is a big player in that, and I think will continue to be and continue to expand."

• "So those procedures, GYN procedures . . . you'll see that the addition of those procedures has required a lot of hospitals to get third and fourth systems.  And we see that continuing."

• "You guys probably know more than we do.  Clearly it's not a positive for anyone.  We haven't seen a significant impact yet [on System leasing].  And that is all I can say . . . .  I suspect that they may increase—our leasing companies still have an appetite for these devices."

PRS also argues that, in the case of mixed statements, the non-forward looking portions of statements are actionable.  We need not resolve whether the safe harbor covers non-forward-looking portions of forward-looking statements because, examined as a whole, the challenged statements related to future expectations and performance.  *See Cutera*, 610 F.3d at 1111–12.  Only two statements plausibly fall in this category.  In answer to a question about lower capital expenditures by hospitals, Mohr stated: "At the present time, we don't have any indicators that tell us that's the case.  But we're early into this."  This statement is properly classified as an assumption "underlying or related to" projections for lower hospital expenditures on Systems.  *See No. 84 Emp'r-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 936.  Similarly, when asked if anything in the "external environment" made the executives nervous about System purchases in the next twelve months, Smith responded: "[T]here's always a decision within a hospital of how do they

prioritize their capital investment . . . I think we come up typically fairly high on that priority list. . . .  We aren't hear[ing] anything that causes us any significant concern . . . no change from last quarter, I guess . . . ."  In context, this statement is properly understood as regarding Smith's expectations of the future impact of the external economic environment on Intuitive.

Next, PRS challenges the warnings accompanying the forward-looking statements as inadequate under 15 U.S.C. § 78u-5(c)(1)(A)(i).  The following disclaimer accompanied each of the statements:

> Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements.    Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings. Prospective investors are cautioned not to place undue reliance on such forward-looking statements.

This cautionary language is virtually identical to the cautionary language approved in *Cutera*: "[T]hese prepared remarks contain forward-looking statements concerning future financial performance and guidance . . . management may make additional forward-looking statements in response to questions, and . . . factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results."  610 F.3d at 1112 (internal quotation marks and alteration omitted).  Because the cautionary language was

sufficient, the forward-looking statements are exempt under the PSLRA's safe harbor provision.

## B. Corporate Puffery

Statements of mere corporate puffery, "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," are not actionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.* at 1111 (internal quotation marks omitted). Four of the challenged statements fall into this category. Intuitive communicated optimism (i) that the opportunity for system placement at hospitals "is still very, very large"; (ii) that there is potential for growth in the *dVP* market; (iii) that the company is "reservedly optimistic" about sales; and (iv) wishing it had "a crystal ball," that Intuitive "will come out stronger" and "in a pretty good position" despite the economic crisis.

According to PRS, these pronouncements are objectively verifiable and thus qualify as material misstatements, not mere puffery. The statements are, however, the antithesis of facts. They represent the "feel good" speak that characterizes "non-actionable puffing." *See id.* In *Cutera*, we detailed similar statements, noting that such "optimistic, subjective assessment hardly amounts to a securities violation." *Id.*; *see e.g.*, *id.* ("[N]one of our employees is represented by a labor union, and we believe our employee relations are good" and "everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well"); *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996) (holding that general statements of optimism made in an unstable market were "inactionable forecasts").

PRS relies on *Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996), for the uncontroversial proposition that "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Id.* at 959.  Though that broad statement is undoubtedly true, as PRS underscores, the context in which the statements were made is key.  In *Warshaw*, "the company, whose financial success depended on FDA approval . . . made repeated assurances that FDA approval was 'imminent'" when it knew that it was not. *Syntex Corp. Sec. Litig*., 95 F.3d at 927 (analyzing *Warshaw*).  So too in *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995), "where company officials had made statements that the company's expansion of its retail warehouse operations was successful and that the expansion increased the company's prospects for earnings," when the officials knew that the expansion had failed.  *Syntex Corp. Sec. Litig.*, 95 F.3d at 927 (analyzing *Fecht*).  In this case, "the market already knew" of the difficulties facing Intuitive through the Oppenheimer Report and other sources.  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996).  In context, any reasonable investor would have understood Intuitive's statements as mere corporate optimism.

Citing *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir. 1989), PRS argues that these four statements are not puffery because they were *in fact* relied on by investors.  However, *Apple* does not suggest that in determining whether a statement is mere puffing we should consider the mindset of the public.  *See id.* at 1116 ("[E]vidence of stock price movements provides no rational basis for determining whether [the product's] risks were adequately conveyed to the public.").  PRS's construct skips a step.  Absent an actionable misstatement, reliance does not come into play.  *See id.* at 1113 ("In the usual claim under

Section 10(b), the plaintiff must show individual reliance on a material misstatement."). Theoretical reliance cannot transform corporate optimism into a securities violation.

## C. Actionable Omissions

PRS takes aim at the 2007 Annual Report Intuitive filed with the SEC. Acknowledging that the report was factually accurate, PRS nonetheless claims that certain statements in the report altered the "total mix" of information available to investors by failing to disclose "known trends." In particular, PRS faults the report for not detailing that system placement was declining because of market saturation and the economic downturn, that new Systems were being purchased at higher utilization rates, and that *dVP* growth was declining faster than anticipated.

In other words, PRS faults Intuitive for not providing a more fulsome report. The securities laws do not demand such reporting. Rule 10b–5 prohibits "*only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). We have expressly declined to require a rule of completeness for securities disclosures because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* In practical terms, "[t]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*

Nothing about the statements in the 2007 Annual Report would give a reasonable investor the impression that

Intuitive's growth was different than it was in reality.  The statements accurately reflect the company's growth in 2007; they do not purport to speak to any trends in Intuitive's growth or revenues and do not alter the total mix of information available to investors.[4]  The 2007 Annual Report is neither incomplete nor misleading.

## II. Scienter

The remaining challenged statements relate to denials that the Intuitive sales force observed delayed deals, reduced System sales, or an impact on buying patterns due to the economic downturn.  Because the complaint failed to allege facts sufficient to raise a strong inference that the individual defendants knew of these circumstances, PRS has not established the necessary scienter under the PSLRA.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  Scienter is adequately pleaded when "*all* of the facts alleged, taken

---

[4] To the extent that PRS's argument relies on the failure to comply with Rule S-K, which requires that "known trends" be disclosed in certain SEC filings, that allegation is insufficient for a claim under Rule 10(b).  *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("While § 229.303(a)(3)(ii) provides that 'known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed." (citing 17 C.F.R. § 229.303(a))).  Intuitive cannot be liable for failing to make disclosures it was expressly not required to make under the securities laws.

collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. This means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

PRS endeavors to establish scienter through three different avenues: (i) a core operations theory; (ii) witness accounts; and (iii) evidence of insider trading. The factual allegations fall short of establishing a strong inference of scienter. Read as a whole, the allegations in the complaint at best establish "mere recklessness or a motive to commit fraud and opportunity to do so," and are "not independently sufficient." *Reese*, 747 F.3d at 569.

## A. Core Operations

The core operations theory of scienter relies on the principle that "corporate officers have knowledge of the critical core operation of their companies." *Id.* Core operations may support a strong inference of scienter under three circumstances:

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations . . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the

> PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008) (internal quotation marks omitted).

Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, *see id.* (collecting cases); or witness accounts demonstrating that executives had actual involvement in creating false reports. *See id.* at 785 (explaining that information about corporate structure may raise a strong inference of scienter "in conjunction with detailed and specific allegations about management's exposure to factual information within the company"); *see, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022–23 (9th Cir. 2005).

The complaint lacks allegations of specific admissions by the individual defendants regarding their involvement with Intuitive's operations or with the software-generated reports. Instead, PRS points to the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with Intuitive's day-to-day operations and were familiar with the contents of the software-generated reports because the substance of the reports was discussed in meetings. PRS also references remarks by the individual defendants that they were "going through the sales pipeline." The closest PRS gets is a

statement from Smith that "no one has seen any deal delays" due to "the overall credit crunch market," which the complaint misleadingly paraphrases as Smith admitting that he "actively sought and received information from the sales force regarding the effects of the economic crisis and credit crunch on system placements."

At best, these facts support a "mere inference of [the defendants'] knowledge of all core operations," not scienter. *See S. Ferry LP*, 542 F.3d at 785 (internal quotation marks omitted). Missing are allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives. *See, e.g.*, *Zucco*, 552 F.3d at 1000 ("[A]llegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter (through the use of the Access databases), and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter). "[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). The allegations here are insufficient to defeat the competing inference and conclude that the executives "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [they] could have done so without extraordinary effort." *Reese*, 747 F.3d at 569 (internal quotation marks omitted).

Finally, this is not the "rare circumstance" in which it would be "absurd" to suggest that management was without knowledge of the contents of the reports because there are no allegations regarding discussions of the reports'

contents—other than that some discussions occurred at some point.  *See S. Ferry LP*, 542 F.3d at 786.  Mere access to reports containing undisclosed sales data is  insufficient to establish a strong inference of scienter.  *See Zucco*, 552 F.3d at 1001.

## B.  Witness Accounts

Next, PRS points to a single statement by a lone witness, a clinical sales representative in Florida who worked for Intuitive for three months and said, "100% that hospitals were cutting back."  This impression of a low-level employee is just that—an unsubstantiated statement without substance or context.  The complaint lacks critical information about whether the statement refers exclusively to the Florida market, how many hospitals were cutting back, how much and when the hospitals were cutting back, or whether they were cutting back on system placement or recurring revenue sources.  This vague and incomplete statement hardly supports a claim that the individual defendants knew or should have known that sales were slowing and that Intuitive would not meet its financial projections.

Although PRS does not rely on any other witness accounts to support an inference of scienter, on de novo review we consider the complaint in its entirety.  Other witness statements similarly lack foundation because they do not detail the actual contents of the reports the executives purportedly referenced or had access to; the statements provide only snippets of information, not a view of the company's overall health; and the witnesses lack first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health.  Taken as a whole and crediting the statements, although incomplete,

these allegations do not defeat the competing inference that the individual defendants thought that Intuitive could get through the economic downturn without suffering the losses it ultimately suffered.

## C. Insider Trading

Intuitive also relies on evidence of insider trading, which can serve as circumstantial evidence of scienter, but "is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (internal quotation marks omitted). The allegations that the individual defendants (excluding Cukic and Gong) made significant profits from the sale of Intuitive stock do not raise an inference of scienter, let alone a strong inference, because the complaint contains no allegations regarding the defendants' prior trading history, which are necessary to determine whether the sales during the Class Period were "out of line with" historical practices.[5]  *See id.*

## CONCLUSION

We affirm the district court's dismissal of the complaint with prejudice.  Read as a whole, PRS's allegations do not satisfy the heightened pleading requirements imposed in

---

[5] PRS also asserts that the spike in compensation raises an inference of scienter, but offers no support for this proposition.

securities fraud cases and do not identify any material misstatements made with scienter.[6]

**AFFIRMED.**

---

[6] We also affirm the dismissal of PRS's claim under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), because PRS has failed to establish "a primary violation of the securities laws." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).