**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE QUALITY SYSTEMS, INC. SECURITIES LITIGATION,

*Debtor.*

CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST; ARKANSAS TEACHER RETIREMENT SYSTEM,

*Plaintiffs-Appellants*,

v.

QUALITY SYSTEMS, INC.; STEVEN T. PLOCHOCKI; PAUL A. HOLT; SHELDON RAZIN,

*Defendants-Appellees.*

No. 15-55173

D.C. No.
8:13-cv-01818-CJC-JPR

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted December 5, 2016
Pasadena, California

Filed July 28, 2017

Before:  Stephen Reinhardt, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Securities Fraud

The panel reversed the district court's dismissal of an action under § 10(b) of the Securities Exchange Act of 1934.

The district court found that some of the defendants' allegedly false or misleading statements were not forward-looking, but found these statements to be "non-actionable puffery."  The district court found that the remainder of the defendants' allegedly false or misleading statements were forward-looking, were accompanied by appropriate cautionary language, and were made without actual knowledge of their falsity, and therefore were protected by the safe harbor provision of the Private Securities Litigation Reform Act.

Disagreeing with the district court, the panel concluded that some of the defendants' statements were "mixed statements," containing non-forward-looking statements as well as forward-looking statements of projected revenue and earnings.  The panel held that a defendant may not transform non-forward-looking statements into forward-looking

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

statements that are protected by the safe harbor provision of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.  The panel held that many of the defendants' non-forward-looking statements were materially false or misleading.  The panel also held that some of the defendants' forward-looking statements were materially false or misleading, were not accompanied by appropriate cautionary statements, and were made with actual knowledge of their false or misleading nature.  The panel remanded the case for further proceedings.

## COUNSEL

Joseph  D. Daley (argued), Christopher D. Stewart, and Robert R. Henssler, Jr., Robbins Geller Rudman & Dowd LLP, San Diego, California; Benjamin Galdston, Blair A. Nicholas, Brandon Marsh, and Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP, San Diego, California; Avi Josefson and Gerald Silk, Bernstein Litowitz Berger & Grossman LLP, New York, New York; Stephen H. Cypen, Cypen & Cypen, Miami Beach, Florida; for Plaintiffs-Appellants.

Peter A. Wald (argued), Latham & Watkins, San Francisco, California; Andrew R. Gray and Michele D. Johnson, Latham & Watkins LLP, Costa Mesa, California; Colleen C. Smith, Latham & Watkins LLP, San Diego, California; for Defendants-Appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and Arkansas Teacher Retirement System brought this would-be class action on behalf of all persons or entities who purchased or otherwise acquired the common stock of Quality Systems, Inc. ("QSI") between May 26, 2011, and July 25, 2012 ("the Class Period"). Plaintiffs allege that during the Class Period defendant QSI and several of its officers ("Defendants") made false or misleading statements about the current and past state of QSI's sales "pipeline," and used those statements to support public guidance to investors about QSI's projected growth and revenue. Individual defendants are Sheldon Razin, QSI's founder and Chairman of the Board; Steven Plochocki, QSI's Chief Executive Officer ("CEO"); and Paul Holt, QSI's Chief Financial Officer ("CFO"). Plaintiffs allege that the individual defendants had real-time sales information showing a decline in sales due to market saturation beginning as early as April 2011, and that individual defendants knew that their public statements denying any decline were false or misleading.

The district court dismissed Plaintiffs' complaint with prejudice, finding that Defendants' non-forward-looking statements about the past and current state of QSI's sales pipeline were non-actionable puffery, and that their forward-looking statements about projected growth and revenue were protected by the safe harbor provision of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5. We reverse and remand for further proceedings.

## I. Background

QSI is a California corporation that "develops and markets practice management and electronic health records ('EHR') software to medical and dental care providers." QSI was founded in 1974 by defendant Sheldon Razin, who was President and CEO until 2000.  QSI benefited significantly from the passage of the 2009 American Recovery and Reinvestment Act, which provided $60 billion in incentives for healthcare providers to convert from paper to electronic records.  During the Class Period, QSI's stock price largely depended on investors' belief that its revenues were growing rapidly.  QSI's growth largely depended, in turn, on sales and maintenance of new software systems for healthcare providers, which "included software, hardware, third-party software, supplies and implementation and training services components."  New system sales were particularly important because they "included the promise of future, high-margin maintenance revenue." During QSI's Fiscal Year 2012 (April 2011 through March 2012), over 66 percent of QSI's total revenues came from sales and maintenance of such new software systems.

QSI's largest division, NextGen, develops and sells software systems for medical offices.  During FY 2012, NextGen accounted for 75 percent of QSI's total revenue.  During that same period, NextGen accounted for 83 percent of QSI's revenue from software systems sales and 84 percent of its revenue from software systems maintenance.

QSI's primary source of growth was sales of software systems to healthcare providers who were adopting electronic healthcare systems for the first time, referred to as "greenfield" sales.  QSI's most profitable source of revenue

was new practice management and electronic health records software.  Sales and maintenance of this software had gross margins of 75.7 percent and 61.6 percent, respectively.

During the Class Period, QSI kept continuous track, in real time, of its sales "pipeline."  The pipeline comprised four categories.  Category 1 included deals that were expected, with 70 percent certainty, to close within three to four months.  Category 2 included deals that were expected, with 70 percent certainty, to close within six to eight months.  Categories 3 and 4 included deals that were not expected to close within eight months.

The gravamen of Plaintiffs' suit is that the individual defendants knew during the Class Period that the market for healthcare software systems was becoming increasingly saturated, and that greenfield sales opportunities were decreasing.  The complaint alleges that from late 2011 through mid-2012 (roughly, from the beginning of the second half of FY 2012 through the first quarter of FY 2013), Defendants misrepresented the state of QSI's current and past sales pipeline and used the misrepresentations to support projections of growth in revenue and earnings.  The complaint alleges that QSI's projected growth "lacked any objective basis and . . . [was] totally inconsistent with QSI's actual business performance."  (Quotation marks omitted).

On July 26, 2012, QSI issued a press release finally admitting publicly that the company's business was in steep decline.  As a result of this announcement, QSI stock prices dropped precipitously, causing Plaintiffs significant losses.

A. False or Misleading Statements

The following narrative is taken from Plaintiffs' amended complaint. We take as true the complaint's plausible and properly pleaded allegations, which we recount below. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

The complaint alleges that on a number of occasions Defendants, particularly CEO Plochocki, made false or misleading statements of current and past facts, as well as false or misleading statements of projected growth in revenue and earnings per share.

On June 9, 2011, at a Goldman Sachs Global Healthcare Conference, CFO Holt stated that the market for QSI's products in ambulatory health care facilities was "greenfield for the most part" and that he thought "it's going to be that way for a while."

On October 27, 2011, QSI held an analyst conference call. When asked whether the electronic health records market was becoming saturated, Plochocki responded that "the greenfield opportunities are plentiful. [M]ore than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales." During that call, Plochocki predicted a "revenue range of growth of 21% to 24% for the year and an EPS [earnings per share] growth of 29% to 33% for the year."

On November 7, 2011, *Investor's Business Daily* published an interview with Plochocki entitled "Quality Systems Chief Says Boom Just Getting Started." Plochocki

was quoted as saying, "There is nothing drying up and there is nothing slowing down."

On December 14, 2011, Plochocki participated in an Oppenheimer & Company, Inc., Healthcare Conference.  At that conference, he stated, "So the bottom line is that our pipeline current and our pipeline future are very robust."  In response to a comment that large and mid-size medical practices may be totally penetrated, Plochocki stated, "You wouldn't know that by our pipeline and you certainly would not know that by our categories three and four in our pipeline."

On January 9, 2012, at a J.P. Morgan Healthcare Conference, Plochocki stated that QSI had "given analysts prognostications for . . . earnings per share growth [in the] 29% to 34% range."

On January 26, 2012, in a conference call with analysts, Plochocki stated, "Our pipeline continues to build to record levels."  In that same conference call, after stating that he had access to current internal data, NextGen President Scott Decker stated, "[W]e haven't changed any of the model in our reporting pipeline, so it's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years."

On February 7, 2012, Plochocki participated in a UBS Global Healthcare Services Conference.  At that conference, he stated, "[W]e have $183 million worth of pipeline, the business we intend to close within the next six to eight months.  That sales pipeline has grown every quarter since

the announcement of the stimulus bill back in February of 2009 and we view it as continually growing[.]"

On May 7, 2012, Plochocki participated in a Deutsche Bank Healthcare Conference.  At that conference, he stated that he had access to up-to-the-minute sales information that showed that "[t]he deals are elongated." "[T]he deals are taking a little bit longer to get done."  On May 8, J.P Morgan characterized Plochocki's commentary as "downbeat."

On May 9, 2012, in response to J.P. Morgan's negative characterization, Decker appeared before investors at a Robert W. Baird & Co. Growth Stock Conference.  In response to a question about Plochocki's statement two days earlier, Decker said, "[S]ome comments earlier this week at another conference were made . . . that [the sales cycle] may be lengthening. . . . [I]t is absolutely not a macro trend we are seeing.  In fact, I went back through the data over the last few days and objectively looked at it.  Sales cycle has not lengthened for us across the board, and in fact, over the last year, you've seen a compression of it."

On May 10, 2012, QSI issued a press release that was filed that same day with the Securities and Exchange Commission on Form 8-K.  In the press release, QSI announced that it expected to miss by material amounts its previously announced guidance for FY 2012.  The press release attributed the declining sales to delays in closing deals.  The press release provided optimistic guidance for FY 2013, stating that "earnings per share are expected to grow between 20 and 25 percent versus the 2012 fiscal year."

On May 14, 2012, Holt appeared at a JMP Securities Research Conference.  He reiterated the guidance provided in

the press release four days earlier.  He stated, "[W]e tried to be very thoughtful about it and I think it's certainly—we're confident I think in the guidance that we gave."

On May 17, 2012, in a conference call, Plochocki told analysts that the poor FY 2012 results were a one-time event. He attributed the poor results to "delays in both the closing of several fourth-quarter opportunities, as well as recognition of revenue related to a large customer implementation."  He emphasized the current state of QSI's sales pipeline:  "Our pipeline is deep.  Our categories one and two are strong. . . . [I]f the fundamentals have changed, that would be a different story.  But our fundamentals haven't changed.  Our pipeline keeps growing, categories one and two are very deep and vibrant for us this quarter.  We haven't seen any fundamental change to any of the dynamics that have been feeding into our system for the last two to three years."  Plochocki stated that "we remain confident about the growth opportunities, as evidenced by our recent guidance in the 2013 fiscal year.  We have stated that we expect . . . earnings per share to grow 20% to 25%."  During that same conference call, CFO Holt also emphasized the current state of QSI's sales pipeline: "We are confident in our ability to deliver on this guidance. . . . Supporting our confidence in this guidance range are a number of factors, including our current sales pipeline[.]"

On June 26, 2012, QSI filed with the SEC an Open Letter to Shareholders, signed by Plochocki and Razin, as part of proxy materials.  Plochocki's and Razin's letter stated, "We are also confident about our growth prospects.  For fiscal 2013, we expect . . . earnings per share to grow by 20–25%." On June 30, 2012, four days later, the first quarter of QSI's FY 2013 ended.  During that quarter, QSI's earnings per share had declined by 19 percent compared to the same

quarter one year earlier. QSI did not release this information publicly at that time. On July 9, 10, 13, and 23, 2012, QSI submitted proxy materials to the SEC, signed by Plochocki and Razin, in which it repeated the statement that it expected earnings and earnings per share to grow by 20–25 percent.

On July 26, 2012, QSI issued a press release announcing that its earnings per share had declined by 19 percent as compared to the first quarter of FY 2011. Plochocki stated publicly that "we are not affirming our previous guidance nor providing revised guidance."

## B. Scienter

The complaint alleges that the individual defendants were aware in real time of QSI's financial information, and knew that their statements about the current and past state of QSI's sales pipeline as well as their projections of future revenue and earnings were inconsistent with this information.

The complaint includes information about Defendants' knowledge provided by three high-level officers of QSI. First, Ahmed Hussein is a major shareholder of QSI. He was a member of the Board of Directors beginning in 1999. He resigned as a Director in May 2013. In his letter of resignation submitted to the Board, Hussein described what he characterized as securities laws violations by QSI, Plochocki, and Razin. He subsequently filed a verified complaint in California state court against QSI, Plochocki, and Razin. During his time as a Director, Hussein routinely interacted with Defendants Plochocki, Razin, and Holt. According to Hussein, QSI engaged in a "'continuous reforecasting process' based on real-time information concerning QSI revenues and income," "business

performance [and] sales pipeline." According to Hussein, Defendants "were aware of real time data that contradicted their public statements."

Second, Confidential Witness 6 ("CW6") was a QSI Director from June 2008 through September 2009, and was QSI's Chief Operating Officer from September 2009 through May 2010. CW6 stated that Salesforce reports were available "at the push of a button." CW6 stated that he could see in early 2010 that the market was going to a recurring revenue model and that the big license sales that had fueled QSI's growth were no longer going to work. CW6 warned Razin that changes needed to be made in QSI's business model to take this into account.

Third, Confidential Witness 7 ("CW7") was a QSI Director from 2004 to September 2009. CW7 stated that QSI's senior executives continually monitored QSI's revenues and earnings. According to CW7, QSI management knew on a monthly basis how QSI was doing.

The complaint also contains information about Defendants' knowledge provided by five lower-level QSI employees. First, Confidential Witness 1 ("CW1") was a product manager in Pennsylvania, between approximately November 2010 and September 2013, in QSI's NextGen division. CW1 noticed a slowdown in QSI's business beginning in April 2011, and noticed that "new sales opportunities had gone away." CW1 stated that QSI communicated to its employees that QSI was entering a "replacement market whereby QSI sought to replace competitors' systems." About 15 percent of CW1's compensation was based on NextGen sales figures. Between November 2010 and November 2011, QSI cut back and then

stopped paying this portion of his compensation because QSI "was failing to hit its sales targets."

Second, Confidential Witness 2 ("CW2") was the Chief Information Officer ("CIO") of Practice Management Partners, a company acquired by QSI in late 2008. CW2 became CIO of QSI's Revenue Cycle Management division. CW2 stated that NextGen had experienced a slowdown in business by April 2011. CW2 recounted that Plochocki explained in internal conference calls sometime around March 2011 that the market for new systems "had become saturated, and that any sales QSI was making were largely to replace existing EHR [electronic health record] systems."

Third, Confidential Witness 3 ("CW3") was a NextGen Sales Executive from September 2011 to September 2012 for a sales region in California. According to CW3, everyone in his region was missing their sales targets, often by more than 50 percent. CW3 believed that other regions were also missing their sales targets by about 50 percent.

Fourth, Confidential Witness 4 ("CW4") was a NextGen Sales Executive from 2008 to December 2011, with responsibilities for sales in Virginia, Pennsylvania, and West Virginia. According to CW4, all executives at QSI had access to sales data that were compiled on the company's Salesforce software. QSI executives became increasingly involved with prospective deals in the pipeline as the end of a quarter approached.

Fifth, Confidential Witness 5 ("CW5"), based in Pennsylvania, was a Sales Analyst at NextGen from July 2010 to October 2012. CW5 compiled reports of booked and forecasted business, and arranged for the reports to be

automatically delivered to the office of defendant Holt on a weekly or monthly basis.  According to CW5, QSI officials monitored NextGen closely because it provided the vast majority of QSI's revenue.

## C. Declines in Share Price

During the Class Period, QSI stock traded at a high of $50.04 on September 27, 2011.

On Friday, May 4, 2012, QSI stock traded at $36.99 per share.  On Monday, May 7, Plochocki disclosed that "deals are taking a little bit longer to get done."  On Tuesday, May 8, analysts cut their forecasts for QSI earnings.  At the end of the day on Tuesday, QSI stock had fallen to $30.99 per share, a decline of about 16 percent.

On July 26, 2012, QSI announced that its earnings per share during the first quarter of FY 2013 had fallen 19 percent, and Plochocki withdrew his earlier guidance. QSI's stock price immediately dropped from $23.63 per share to $15.95, a decline of about 33 percent.

## D. Stock Sale by Plochocki

On February 24, 2012, Plochocki sold 88,500 shares of QSI stock at a price of $43.99 per share.  The sale represented 87 percent of Plochocki's holdings of QSI stock.   The proceeds of the sale were more than seven times Plochocki's FY 2012 salary.

## II. Standard of Review

We review de novo a district court's dismissal for failure to state a claim.  "We take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party."  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint alleging a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), must meet both the heightened pleading requirements for fraud claims under Fed. R. Civ. P. 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud," and the "exacting pleading requirements," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (*Tellabs*), 551 U.S. 308, 313 (2007), of the Private Securities Litigation Reform Act ("PSLRA"), which require that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A).  In determining whether the complaint has satisfied these standards, we "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322–23.

## III. Discussion

The complaint alleges that Defendants' non-forward-looking statements about the current and past state of QSI's sales pipeline were materially false or misleading.  The complaint also alleges that Defendants' forward-looking statements about projected revenue and earnings were materially false or misleading, were made without adequate cautionary statements, and were made with actual knowledge of their false or misleading nature.  The complaint alleges that

Defendants' statements—both non-forward-looking and forward-looking—violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

As we have explained,

> Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.'  15 U.S.C. § 78j(b).   Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful . . . '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'  17 C.F.R. § 240.10b-5(b).

*In re Cutera Securities Litigation*, 610 F.3d 1103, 1108 (9th Cir. 2010).

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund,*

*Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted).  Only the first two elements are at issue here.

Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded from liability by the "safe harbor" provision of the PSLRA.  The PSLRA exempts from liability any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or that the plaintiff fails to prove was made "with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1).  That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading.  *Cutera*, 610 F.3d at 1112–13.

The district court found that some of Defendants' allegedly false or misleading statements were not forward-looking, but found these statements to be "non-actionable puffery."  The district court found that the remainder of Defendants' allegedly false or misleading statements were forward-looking, were accompanied by appropriate cautionary language, and were made without actual knowledge of their falsity.  In reaching its conclusion about cautionary language, the district court took judicial notice of a number of PowerPoint slides containing cautionary language that Defendants contend were displayed during presentations at six health care conferences.

We disagree with the district court. First, some of Defendants' statements were "mixed statements," containing non-forward-looking statements as well as forward-looking statements of projected revenue and earnings. We hold a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings. Second, we hold that many of Defendants' non-forward-looking statements were materially false or misleading. Third, we hold that some of Defendants' forward-looking statements were materially false or misleading, were not accompanied by appropriate cautionary statements, and were made with actual knowledge of their false or misleading nature.

We therefore reverse and remand for further proceedings.

## A. Non-Forward-Looking Statements

### 1. Mixed Statements

Plaintiffs contend that a number of Defendants' statements were "mixed," containing non-forward-looking statements about current and past facts as well as forward-looking statements about projected growth in revenue and earnings. They contend that the non-forward-looking parts of Defendants' statements reciting current and past facts are not protected by the safe harbor provision of the PSLRA.

We have not previously addressed in this circuit the status of mixed statements under the PSRLA. In *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051

(9th Cir. 2014), plaintiffs contended that the non-forward-looking portions of mixed statements were not protected by the safe harbor provision.  However, we did not need to "resolve whether the safe harbor covers non-forward-looking portions of forward-looking statements" in that case because "examined as a whole" the statements were forward-looking statements. *Id.* at 1059.

Several of our sister circuits have, however, addressed mixed statements.  The First, Second, Third, Fifth, and Seventh Circuits have all concluded that where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA.  *See In re Stone & Webster, Inc., Securities Litigation*, 414 F.3d 187, 211–13 (1st Cir. 2005); *In re Vivendi, S.A., Securities Litigation*, 838 F.3d 223, 246 (2d Cir. 2016); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009); *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 691–92 (5th Cir. 2014); *Makor Issues & Rights, Ltd. v. Tellabs Inc.* (*Tellabs II*), 513 F.3d 702, 705 (7th Cir. 2008).  We agree with these circuits.

The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events.  But the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts.  Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.  As the First Circuit observed:

> The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement. The safe harbor, we believe, is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement.

*Stone & Webster*, 414 F.3d at 213.

*Stone & Webster* provides a useful example of an unprotected false or misleading non-forward-looking statement embedded in a mixed statement. Company representatives had repeatedly stated, with slight variations in wording, that the company "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs." *Id.* at 211. The First Circuit held that the portion of the statement referring to accessible funds was not protected:

> [T]he alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs. In our view the safe harbor of the PSLRA does not confer a *carte blanche* to lie in such representations of current fact.

*Id.* at 213.

*Tellabs II* provides another useful example.  In that case, the company had stated that sales were "still going strong." *Tellabs II*, 513 F.3d at 705.  The Seventh Circuit held that this statement was not protected by the safe harbor:

> [A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present. When Tellabs told the world that sales of its 5500 system were "still going strong," it was saying both that the current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse.  The element of prediction in saying that the sales are "still going strong" does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales.

*Id.*

### 2. Non-Forward-Looking Statements

On eight separate occasions, QSI officers knowingly made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline.

On June 9, 2011, at a Goldman Sachs Healthcare Conference, CFO Holt stated that the market for QSI's products in ambulatory health care facilities was "greenfield for the most part."  On an October 27, 2011, conference call, in response to a question whether the electronic health records market was becoming saturated, CEO Plochocki

stated that "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales." On November 7, 2011, Plochocki was quoted in *Investor's Business Daily* as saying, "There is nothing drying up and there is nothing slowing down." On December 14, 2011, at an Oppenheimer Healthcare Conference, in response to a comment that the large and mid-sized medical practices may be totally penetrated, Plochocki stated, "You wouldn't know that by our pipeline." On a January 26, 2012, conference call, Plochocki stated, "Our pipeline continues to build to record levels." During that conference call, NextGen President Decker stated, "[I]t's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years." On February 7, 2012, at a UBS Healthcare Conference, Plochocki stated, "Th[e] pipeline has grown every quarter since the announcement of the stimulus bill back in February of 2009." On May 9, 2012, at a Robert W. Baird & Co. Growth Stock Conference, responding to concerns that the sales cycle might be lengthening, Decker stated, "I went back through the data . . . and objectively looked at it. Sales cycle has not lengthened for us across the board, and in fact, over the last year, you've seen a compression of it." On a May 17, 2012, conference call, Plochocki stated, "Our pipeline is deep. Our categories one and two are strong. . . . [O]ur fundamentals haven't changed. Our pipeline keeps growing, categories one and two are very deep and vibrant for us this quarter. We haven't seen any fundamental change to any of the dynamics that have been feeding into our system for the last two or three years."

During the Class Period, no one at QSI corrected the foregoing non-forward-looking statements about the state of QSI's sales pipeline.

### a. Materiality

The district court concluded that any non-forward-looking statements were mere puffery, and therefore non-material. We disagree.

"When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. . . . [P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Cutera*, 610 F.3d at 1111 (internal quotation marks omitted). Examples of "mere corporate puffery" include statements such as "the opportunity for system placement at hospitals 'is still very, very large,'" and that a company "'will come out stronger' and 'is in a pretty good position' despite the economic crisis." *Intuitive Surgical*, 759 F.3d at 1060. But even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996). For example, reassuring investors that "everything [was] going fine" with FDA approval when the company knew FDA approval would never come was materially misleading. *Id.*; *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 927–28 (9th Cir. 1996) (analyzing *Xoma*). Similarly, a statement that the company "anticipates a continuation of its accelerated expansion schedule" when the expansion had already failed was materially misleading. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

The non-forward-looking statements, recounted above, about the current and past state of QSI's pipeline went

beyond "feel good" optimistic statements.  Plochocki and the others did not just describe the pipeline in subjective or emotive terms.  Rather, they provided a concrete description of the past and present state of the pipeline.  They repeatedly reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters.  Plochocki did not just say that he believed plenty of opportunities for new system sales existed; he told investors what proportion of the large and mid-sized practice markets he believed were greenfield, and reassured them that the pipeline was full and growing.    These statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."    *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

### b. False or Misleading

The non-forward-looking statements of Plochocki and other QSI officers were inconsistent with real-time financial information and were materially false or misleading.  CW2, the Chief Information Officer of a division acquired by QSI in 2008, recounted that Plochocki explained in internal QSI conference calls as early as March 2011 that the market for new systems "had become saturated, and that any sales QSI was making were largely to replace existing EHR [electronic health record] systems."    CW2 described a slowdown in NextGen's business beginning in April 2011.  CW2 stated that Plochocki personally explained on conference calls as early as April 2011 that the market had become saturated after a "bubble" and that QSI would be forced to switch from greenfield sales to replacement systems.  CW1, a product manager in NextGen, reported that the bonus portion of

CW1's compensation, which was based on NextGen sales figures, had been eliminated by November 2011. Ahmed Hussein, a member of QSI's Board of Directors until May 2013, stated that "QSI's sales pipeline had been declining in the fourth quarter of fiscal 2012 [beginning January 1, 2012]." CW3, a NextGen Sales Executive from September 2011 to September 2012, stated that in CW3's region, sales executives were falling short "often by more than 50%" and that CW3 "believed other regions were similarly missing their targets by about 50%."

### c. Scienter

Plaintiffs' complaint has adequately pleaded scienter. Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In this circuit, the "required state of mind" is a mental state that not only covers "'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman v. Arena Pharamceuticals*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted). To assess whether the complaint meets this standard, we "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal

knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted).

The complaint describes the confidential witnesses on whose statements Plaintiffs rely "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). As in *Daou*, the complaint includes each confidential witness's job description and responsibilities, and, in some instances, the witness's "exact title and to which [QSI] executive the witness reported." *Id.* at 1016. For example, CW6 was a QSI director who served as the Company's COO from September 2009 through May 2010. Although CW6 was not at QSI during the Class Period, as COO CW6 had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales. CW2 was Chief Information Officer of one of QSI's divisions. In that capacity, CW2 was on a conference call during which Plochocki stated in March 2011 that the market for electronic health records software (produced and sold by the NextGen division) had become saturated. *See Zucco Partners*, 552 F.3d at 999 (confidential witness report of statement made directly to CW by defendant can be "indicative of scienter"). CW5, a NextGen Sales Analyst during the Class Period, personally compiled sales reports using Salesforce, NextGen's sales management software, and "arranged for sales reports to be automatically delivered to . . . the CFO [Holt]'s office, either on a weekly or a monthly basis."

"Taken collectively," statements by confidential witnesses establish that members of executive-level management,

including individual defendants, had access to and used reports documenting in real time the decline in sales during the Class Period.  *See Tellabs*, 551 U.S. at 323.  The complaint includes multiple statements from confidential witnesses with personal knowledge of QSI's declining sales during the Class Period.  CW1's and CW4's statements establish the existence of "funnel reports" and sales forecasts through the Salesforce software that were available to executives.  CW5 had personal knowledge of the fact that sales reports were "automatically delivered to the management team."  And CW7 "confirm[s] that QSI's senior executives" were in the habit of "continually monitor[ing] the Company's revenues and earnings."  These "particularized allegations that defendants had 'actual access to the disputed information,' . . . raise a strong inference of scienter."  *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (quoting *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014)).

QSI's executives themselves told investors they had real-time access to, and knowledge of, sales information. Plochocki and Decker repeatedly described the state of QSI's sales pipeline to analysts and investors.  For example, Plochocki told analysts on the May 26, 2011, conference call that QSI used information maintained in Salesforce databases to report its sales pipeline and make revenue forecasts for its SEC filings.  His statement is comparable to statements in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004), where "top executives admit[ted] to having monitored [a] database" of sales data, and "Plaintiffs…[made] specific allegations regarding large portions of" that sales data that contradict those same executives' public statements.  In its SEC filings, QSI stated

that it "continually updated" its revenue estimates using Salesforce software.

A showing of scienter specific to Plochocki is reinforced by his sale of 87 percent of his QSI stock holdings on February 24, 2012, netting him proceeds of more than seven times his FY 2012 salary. "'Unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter . . . ." *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999), *superseded by statute on other grounds* (citation omitted). "To evaluate suspiciousness of stock sales, we consider, *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle Corp.*, 380 F.3d at 1232. Plochocki's massive and uncharacteristic sale in February, made near the apogee of QSI's stock price during the Class Period, and shortly before the stock went into a steep decline (bottoming out on July 26, 2012) is, to say the least, "suspicious." *Compare Silicon Graphics*, 183 F.3d at 987 (sale of 43.6 and 75.3 percent of respective holdings "somewhat suspicious"). Plochocki's sale came approximately a month after he had personally reaffirmed earnings per share guidance on January 26, 2012, stating that QSI's "pipeline continues to build to record levels." A mere two weeks before the sale, he had told audiences at the UBS Global Healthcare Services Conference that "we view [the pipeline] as continually growing." That Plochocki chose to sell the vast majority of his shares in QSI shortly after boasting to investors that QSI anticipated record levels of sales in the next six to eight months gives rise to a "strong inference" that Plochocki knew adverse information about the state of QSI's sales he was not sharing with the general public. *See* 15 U.S.C. § 78u-4(b)(2)(A); *No. 84 Employer-*

*Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939–40 (9th Cir. 2003) (sales of large percentages of various executives' holdings, more than twenty months after the previous sale and near the stock's peak price gives rise to a "strong inference of scienter").

### B. Forward-Looking Statements

During the Class Period, Defendants repeatedly made revenue and earnings projections. Such projections are, by definition, forward-looking statements. 15 U.S.C. § 78u-5(i)(1)(A), *see also Cutera*, 610 F.3d at 1111. The district court found that all of Defendants' forward-looking statements were accompanied by "sufficiently meaningful" cautionary language, and that plaintiffs "fail[ed] to 'state with particularity facts giving rise to a strong inference that defendant[s] acted with the required state of mind'" for forward-looking statements. (Quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002).) The district court therefore concluded that all of Defendants' forward-looking statements were protected by the PSLRA's safe harbor. We disagree.

Defendants' forward-looking statements may be divided into two groups: forward-looking statements made as part of mixed statements in which the non-forward-looking statements were materially false or misleading; and free-standing forward-looking statements. We take them in turn.

### 1. Forward-Looking Statements as Part of Mixed Statements

Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement. If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be "sufficiently meaningful" to qualify the statement for the safe harbor.

Defendants made a number of forward-looking statements as part of mixed statements. Some were made on conference calls, and some were made at conferences.

Defendants made mixed statements on three conference calls. On the October 27, 2011, conference call, at the same time Plochocki stated that "greenfield opportunities are plentiful," he predicted a "revenue range of growth of 21% to 24% for the year and an EPS growth of 29% to 33% for the year." Plochocki characterized these predictions as "quite conservative" given QSI's "large" pipeline of future business. On the January 26, 2012, conference call Plochocki provided an "update" on guidance for FY 2012, predicting that QSI would report "21% to 24% revenue growth for the year . . . that will be ending in two months" and that they had "upgraded" their earnings per share predictions to increases of 29% to 34% with "a pretty good shot at 35%." In support of these predictions, Plochocki characterized the pipeline as "growing," and Decker stated that "there's nothing out of character in the pipeline that we're reporting today versus what we have seen there in the past couple of years." On the

May 17, 2012, conference call, Plochocki reaffirmed his prediction that QSI earnings per share would grow 20 percent to 25 percent, and Holt attributed QSI's confidence in the prediction to the state of the current sales pipeline. The predictions made during these conference calls were not borne out by events. QSI announced earnings per share for FY 2012 that were 36 percent less than had been predicted. Rather than increasing, earnings per share in the first quarter of FY 2013 declined by 19 percent from the previous year.

The October 27, 2011, and May 17, 2012, conference calls were prefaced by the following identical cautionary language:

> Please note that the comments made on this call may include statements that are forward-looking within the meaning of securities laws, including, without limitation, statements related to anticipated industry trends, the Company's plans, products, perspectives, and strategies, preliminary and projected, and capital equity initiatives in the implementation of potential impacts of legal, regulatory, or accounting principles.

There is nothing before us to show what, if any, cautionary language accompanied the January 26, 2012, conference call.

Defendants also made mixed statements at four conferences. At the June 9, 2011, Goldman Sachs Global Healthcare Conference, Holt stated that the market for QSI's products in ambulatory health care facilities was "greenfield for the most part" and that he thought "it's going to be that way for a while." At the December 14, 2011, Oppenheimer

Healthcare Conference, Plochocki stated that "our pipeline current and our pipeline future are very robust." In response to a comment that large and mid-size medical practices might be totally penetrated, Plochocki responded, "You wouldn't know that by our pipeline[.]" At the February 7, 2012, UBS Global Healthcare Conference, Plochocki stated, "[W]e have $183 million worth of pipeline, the business we intend to close within the next six to eight months. That sales pipeline has grown every quarter since . . . February of 2009 and we view it as continually growing[.]" At the May 9, 2012, Robert W. Baird Growth Stock Conference, Decker stated, "I went back through the data . . . and objectively looked at it. Sales cycle has not lengthened for us across the board, and in fact, over the last year, you've seen a compression of it."

The parties dispute whether a PowerPoint slide that contained cautionary language was shown at these conferences, but there is no dispute about the language on the slide. The print on the slide was relatively small, necessitated by the 372-word length of the cautionary statement. *Inter alia*, the cautionary language provided:

> [T]hese forward-looking statements are subject to a number of risks and uncertainties, some of which are outlined below. As a result, actual results may vary substantially from those anticipated by the forward-looking statements. Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are: the volume and timing of systems sales and installations; length of sales cycles and the installation process; the possibility that products will not achieve or

sustain market acceptance; [followed by fifteen more "important factors"].

That the non-forward-looking statement accompanying the forward-looking statement might be false or misleading was not mentioned.  For present purposes, we will assume that the slide containing the cautionary language was shown in a manner that gave conference attendees a reasonable opportunity to read and understand it.

Adequate cautionary language under the PSLRA must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).    For cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement.  Where, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an "important factor" of which investors should be made aware.

In both the conference calls and at the conferences, Defendants repeatedly told investors that they could rely on predictions of growth in revenue and earnings because the current state of QSI's sales pipeline was consistent with, or better than, the state of the pipeline in previous quarters.  The cautionary language used by Defendants failed to correct these materially false or misleading non-forward-looking statements.  We need not delve deeply into what might, in other cases, constitute adequate cautionary language for

mixed statements, for the answer is clear in the case now before us.  Because Defendants made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline, virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate.  No such cautionary language was provided.

### 2. Free-Standing Forward-Looking Statements

It appears from the materials now before us that Defendants made only two free-standing forward-looking statements, unaccompanied by non-forward-looking statements.  Both were at conferences.  First, at the January 9, 2012, J.P. Morgan Healthcare Conference, Plochocki predicted "earnings per share in the 29% to 34% range."  The complaint does not allege that any non-forward-looking statement accompanied Plochocki's statement.  Second, at the May 14, 2012, JMP Securities Research Conference, Holt reaffirmed the guidance given in a press release four days earlier predicting FY 2013 growth in earnings per share of between 20 percent and 25 percent.  The complaint does not allege that any non-forward-looking statement accompanied Holt's statement.

The district court took judicial notice of a PowerPoint slide, containing cautionary language described above, that Defendants contend were shown at the conferences.  Defendants submitted copies of the slide to the court, accompanied by a statement by one of Defendants' attorneys that he had "personal knowledge" of the fact that the printouts were "true and correct cop[ies] of the written presentation materials" at the conferences.  The statement does not say that the slide was actually shown at the conferences.  A

different defense attorney represented to the district court during oral argument in support of Defendants' motion to dismiss that it was his "understanding" that these materials "were . . . up on a screen projected while the speaker was speaking" and "also posted to the website." The district court concluded, "At each conference, an entire written slide dedicated to the safe harbor provision was shown. Thus, the oral statements were accompanied by cautionary language, by way of the printed slide."

Plaintiffs argue vigorously that the district court erred in taking judicial notice of the fact that the PowerPoint slides containing cautionary language were shown in a meaningful way at the conferences as part of Plochocki's and Holt's presentations. We need not decide whether the district court erred. As described above, there were numerous other statements by Defendants—both non-forward-looking statements and forward-looking statements embedded in mixed statements—upon which to premise Defendants' liability if it turns out that the allegations in the complaint are true. We therefore assume without deciding that the PowerPoint slide containing the cautionary language accompanied Plochocki's and Holt's forward-looking statements on January 9 and May 14, 2012. In the absence of any materially false or misleading non-forward-looking statements, the cautionary language was sufficiently meaningful to qualify for safe harbor.

### 3. Actual Knowledge

Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have "actual knowledge" that the statement was false or misleading. *See Cutera*,

610 F.3d at 1112–13 ("actual knowledge" and "cautionary language" safe harbor prongs are disjunctive). As described above, Defendants had actual knowledge that their non-forward-looking statements were false and misleading. Their forward-looking statements were premised on those non-forward-looking statements. It necessarily follows that they also had actual knowledge that their forward-looking statements were false or misleading.

## IV. Control Person Liability

The complaint alleges that individual defendants Razin, Plochocki, and Holt are liable under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, which assigns joint and several liability for any person who "controls any person liable" under Section 10(b). The district court dismissed the complaint in its entirety based on its conclusion that Plaintiffs had failed to state a claim for relief under Section 10(b). The court thus did not address individual defendants' liability under Section 20(a), which is derivative of liability under Section 10(b). We leave it to the district court to address in the first instance whether Razin, Plochocki, and Holt were control persons within the meaning of Section 20(a).

## Conclusion

We hold that non-forward-looking portions of mixed statements are not eligible for the safe harbor provisions of the PSLRA, 15 U.S.C. § 78u-5. In the case before us, Defendants made a number of mixed statements that included projections of growth in revenue and earnings based on the state of QSI's sales pipeline. For the reasons given above, both the non-forward-looking and the forward-looking

portions of these statements were materially false or misleading. We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**