Filed 11/13/23  Hussein v. Razin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AHMED D. HUSSEIN, | |
| Plaintiff, Cross-defendant, and Appellant, | G061617 |
| v. | (Super. Ct. No. 30-2013-00679600) |
| | O P I N I O N |
| SHELDON RAZIN et al., | |
| Defendants, Cross-complainants, and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed.

Shaerr Jaffe and Donald M. Falk for Plaintiff, Cross-defendant, and Appellant; Ahmed D. Hussein, in pro. per.

Latham & Watkins, Michele D. Johnson, Peter A. Wald, Andrew R. Gray and Whitney B. Weber for Defendants, Cross-complainants, and Respondents.

\*       \*       \*

Ahmed D. Hussein appeals from the trial court's entry of judgment after a jury verdict against him on his fraud and misrepresentation claims against Quality Systems, Inc. (QSI), its founder and largest shareholder, Sheldon Razin,[1] and its chief executive officer at the time in question, Steven Plochocki (collectively defendants). Under California law, a shareholder who alleges he refrained from selling shares in reliance on false representations about the company's financial performance can pursue fraud and misrepresentation claims (holders claims).  (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 171 (*Small*).)

The jury found Hussein failed to meet his burden of proof to establish defendants made false statements or misleading omissions material to Hussein's investment decisions.

On appeal, Hussein challenges the trial court's evidentiary rulings regarding the scope of an expert witness's testimony and cross-examination, and he argues the court erred in rejecting a jury instruction he proposed.  As we explain, Hussein has demonstrated no error by the trial court.  We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

QSI is a publicly traded healthcare technology company specializing in software which enables healthcare providers to move from storing their data in paper records to electronic ones.  At the time of the events in question, in 2011-2012, Hussein was QSI's second largest shareholder.

---

[1]     Mr. Razin passed away in January 2023 during the pendency of this appeal. On Hussein's motion, the parties agreed to his dismissal from the appeal, which we hereby grant.

The jury heard testimony from 17 witnesses over the course of a three-week trial on Hussein's holder's claims.  Consistent with his burden to plead fraud with specificity, Hussein identified statements made by Plochocki and others in leadership positions at QSI, including in public proxy materials.  Hussein alleged the statements induced him to hold his shares rather than sell them; he claimed his decision to hold his shares was based on misleadingly positive statements about QSI's market prospects.  (*Hussein v. Quality Systems, Inc.* (Oct. 8, 2019, G055891) [nonpub. opn.] (*Hussein I*).)  QSI disputed that the statements were false or that Hussein had relied on them.  In support of its argument the company pointed to the fact Hussein undertook a proxy contest around the same time and thus had incentive to preserve his shareholder voting power.  (*Ibid.*)

Statements Hussein later claimed were false included, among others:  (1)  in November 7, 2011, "'Plochocki [told] *Investor's Business Daily* that "worries about flattening and saturation" in the healthcare software market "were baseless," and "there is nothing drying up and there is nothing slowing down"'"; (2) in January 25, 2012, "'Plochocki [told] the board of directors, including [Hussein,] that QSI's growth was "rivaled only by Apple" and that the company expected to achieve 30% revenue and net income growth during its 2013 fiscal year, which began on April 1, 2012"'; and (3)  in a public earnings conference call on January 26, 2012, Plochocki "'stat[ed] that the QSI sales "pipeline" "continues to build to record levels."'"  (*Hussein I, supra*, G055891.)

At trial, QSI personnel described the "pipeline," which QSI kept track of internally, as "an aggregation" of "all of the client opportunities" QSI's salespeople were "currently working on."  QSI divided the "pipeline" into four categories along a spectrum ranging from deals in "Category 1" that were "very close to closing," to "Category 4," in which newer leads were still in "early" development.  Sales representatives tracked their deals using Salesforce sales management software.  QSI reported a snapshot of its

3

"pipeline" to the market each quarter during public earnings calls, using a formula in which it assigned different weights to the four categories.

QSI also presented evidence showing that through 2011, in the fiscal year leading up to some of the statements Hussein later claimed were false or misleading, business was booming for QSI as healthcare providers sought to comply with incentive measures in the American Recovery and Reinvestment Act of 2009 (ARRA). The legislation expressly promoted the adoption of electronic healthcare record (EHR) systems—the same technology QSI sold. Under ARRA, providers who implemented EHR technology certified as meeting certain standards received stimulus payments. The legislation also provided that providers who did not adopt EHR systems by 2015 would face monetary penalties.

Against this backdrop, Plochocki stated in a published 2011 interview that there was "'nothing drying up and there is nothing slowing down."' (Elliott, *Quality Systems Chief Says Boom Just Getting Started*, Investor's Business Daily (Nov. 7, 2011).) At trial, QSI provided the jury with context for Plochocki's comments, including that the EHR software industry was "still in the very first year of that ten-year [ARRA stimulus] program" and "less than a third of the market . . . had adopted any software, let alone certified software." According to QSI, there was "no reason to believe . . . with five years of incentives and in the very first year of a ten-year program, that there was going to be anything to slow down the market."

QSI similarly provided context for other statements later challenged by Hussein. In a public earnings call on January 26, 2012, Plochocki stated QSI's "pipeline continues to build to record levels." QSI's internal data that day put the "pipeline" prospects at $183 million; the number displayed on a PowerPoint slide at QSI's quarterly board meeting the day before—which Hussein attended as a QSI board member—was $181 million.

4

At trial, Plochocki and other QSI witnesses explained the discrepancy as a "normal" byproduct of the manner in which QSI's "pipeline" figures were continually updated. The witnesses further explained that the PowerPoint slide reflecting the $181 million figure for the January 25, 2012 board meeting had been prepared two days earlier, which was three days before the earnings call, and therefore the $2 million increase reported by Plochocki on the call was not evidence of falsified data. Instead, it reflected the updated "pipeline" figures as of the date of the earnings call.

QSI witnesses also provided testimony concerning whether the company's projections for revenue and earnings growth filed in a proxy statement on July 23, 2012, were "reasonable" and "made sense," or whether, as Hussein later claimed, those projections amounted to misrepresentations. QSI's July 23, 2012, proxy statement reflected management's view that "market growth would continue through calendar [year] 2013," despite data on July 18, 2012, which suggested the "pipeline is horrible" according to an internal snapshot that day. QSI's management viewed it as unlikely "the market suddenly dried up," and QSI presented evidence at trial that variable data subject to differing interpretation was "not uncommon."

Thus, when the July 18, 2012 preliminary "pipeline" data seemed to be "horrible," QSI management opted to "get a better feel" for it through further investigation; in the meantime QSI maintained its favorable revenue and earnings growth projections in its July 23, 2012 proxy statement. However, at 8:00 p.m. that same evening, the internal report QSI commissioned came back showing the "pipeline" was "very weak," potentially indicating a "significant pause in the market," with a "positive note" or two, but with a sales prognosis which it seemed would "continue to be rough" in the "short term."

QSI's management team discussed the new data with the board of directors on July 24 and July 25, 2012; late on July 25, they decided to withdraw the market guidance issued in the July 23 proxy statement. QSI did so the next day, on July 26,

5

2012. Paul Holt, who had signed the earlier proxy statement as part of QSI's executive team, testified that QSI's management team did this because the "more important question was to make sure that we were doing the right thing," by "responding . . . , first and foremost, to what we were telling the market."

The immediate drop in QSI's stock price was precipitous. Hussein announced in a press release that his "'concerns regarding the Company's prospects,'" which he claimed prompted his proxy contest, "'were warranted'" and he stated he was "very proud" because "all of what I said came true." Hussein told his chief supporter in the proxy context that if they could not win "now with the stock down 70%, it will never be done."[2]

Hussein did not win the proxy contest. He resigned from QSI's board of directors in 2013 and eventually filed this lawsuit, alleging misrepresentation and constructive fraud claims based on a holder's action theory of recovery under *Small*, *supra*, 30 Cal.4th at p. 171. He asserted he had been planning to sell "all of his QSI stock in late 2011 and early 2012," but decided not to do so because of defendants' alleged false statements.

Following the three-week trial, the jury deliberated for three hours before it returned a defense verdict. On a special verdict form, the jury found individually as to each defendant on Hussein's misrepresentation and concealment claims that neither QSI, nor Razin, nor Plochocki "ma[d]e a false representation[] of fact," nor did they "disclose some fact(s) to Mr. Hussein but intentionally fail to disclose other fact(s), making a representation(s) deceptive."

---

[2]     At trial, Hussein testified he regarded the prospect that he might have taken steps to sell his QSI shares in reliance on statements in QSI's July 23, 2012 proxy materials was "impossible." Specifically, he told the jury, "That's impossible. It's impossible for me to have started a proxy, spent all that money, and [then to have] talk[ed] to [his brokers about selling his shares]—it's impossible."

6

The jury also found against Hussein on his constructive fraud claims, finding Plochocki and Razin did not "mislead Mr. Hussein by failing to disclose . . . accurate and complete information or [by] providing [him] with information that was materially inaccurate or incomplete." The jury found that Razin and Plochocki each "act[ed] on Mr. Hussein's behalf as a shareholder in carrying out their duties as corporate officers or directors of QSI."

The jury found as to Plochocki, but not Razin, that Plochocki "kn[e]w, or should . . . have known, that Mr. Hussein would rely upon [Plochocki's] statements regarding QSI's financial performance or projections." But the jury then answered "No" to the central question pertinent to Hussein's constructive fraud claim: "Did Mr. Razin or Mr. Plochocki mislead Mr. Hussein by failing to disclose to Mr. Hussein accurate and complete information or [by] providing Mr. Hussein with information that was materially inaccurate or incomplete?" With its "No" answer, the jury stopped its analysis, as directed by the instructions on the special verdict form.[3]

The trial court entered the jury's verdict, denied Hussein's new trial motion, and entered judgment for defendants. Hussein now appeals.

## DISCUSSION

Hussein contends the judgment must be reversed because QSI's expert used the word "'puffery'" regarding what Hussein identifies as "two key false and misleading statements" by Plochocki. The expert referred to the statements as puffery in opining

---

[3] Accordingly, the jury did not reach questions 9 and 10 on the special verdict form. Question 9 asked as to Razin and Plochocki individually: "Did Mr. Hussein actually and reasonably rely upon Mr. Razin or Mr. [Plochocki]'s statements regarding QSI's financial performance and projections?" Question 10 then asked: "Was Mr. Razin's or Mr. Plochocki's conduct a substantial factor in causing Mr. Hussein's harm?" The verdict form then continued with other questions the jury did not reach regarding damages, including, "When would Mr. Hussein have sold his QSI stock but for Defendant(s)' conduct?" and "How many shares" would he have sold and "[a]t what price."

7

whether a reasonable investor would rely upon them.  The expert in his deposition had similarly characterized Plochocki's statements as puffery.  At trial, Hussein only objected on unspecified grounds after the expert had already used the word several times.  He later requested the references be stricken from the expert's direct examination when the jury returned the next day.  Hussein contends the court erred in denying his motion to strike.  Hussein's appellate challenges regarding cross-examination of this expert, and Hussein's later request for a jury instruction, also relate to his contentions regarding the puffery issue.

1. *No Error in Solomon's Direct Examination Regarding Puffery*

a. *Background*

At trial, University of California law professor Steven Solomon testified as an expert witness for QSI on "issues surrounding corporate governance, the behavior of investors, what sophisticated investors do, what generally activist investors do, and how those types of investors rely on [different types of] statements."

During Solomon's direct examination, he identified "puffery" and "forward-looking statements" as "specific types of corporate statements" on which investors had "more limited rights to rely."  When QSI's attorney asked Solomon to "explain what puffery is," Solomon defined his use of the term as "a vague statement that's sort of promoting something that's not really capable of measurement."  Hussein did not object to this definition, nor did he object when Solomon gave his opinion that "sophisticated investors in general, don't rely on those types of statements."

Later in Solomon's testimony, QSI's counsel asked him about what counsel referred to as Plochocki's "November 7, 2011, 'Investor's Business Daily' interview that I'll call the 'nothing drying up' statement."  As QSI's counsel noted, a week earlier, Hussein's expert, "Professor Coates testified that this statement would have been important to reasonable investors because it pertains to the fundamentals of the business."

8

When QSI's counsel asked, "Do you agree with that opinion," Solomon answered no and opined the "'nothing drying up'" statement "is, frankly, puffery. It's not clear what he's referring to. It's . . . not measurable." Solomon added this: "[A] sophisticated investor who has millions of dollars on the line, maybe hundreds of millions of dollars, would not rely on this statement for investing purposes. They do their own homework. They follow up and look at things." Solomon opined that such investors are "not the type . . . who would rely on an offhand comment in a second-tier financial publication." Hussein did not object to any of this testimony as it was given, including Solomon's opinion that the "'nothing drying up'" statement was puffery. Solomon then testified regarding what Hussein identifies as another "key false and misleading statement[]" he challenges on appeal as being inaccurately or unfairly characterized by Solomon as puffery.

Specifically, QSI's attorney asked Solomon about Plochocki's statement in a January 26, 2012 earnings call that "talks about 'the pipeline continues to build to record levels.'" When asked if "this [was] the type of statement that an investor would rely on in making investment decisions," Solomon said no because, in his view, the statement was "akin to puffery." Solomon opined "[i]t's not a cogent statement in the sense [of] saying particulars of what the pipeline is or otherwise."

At this point, Hussein's counsel objected and requested a sidebar to discuss the matter "out of the presence of the jury." The sidebar was not reported; when it concluded, Solomon wrapped up his testimony, and then was cross-examined by Hussein's counsel. At the close of the day, the trial court asked Hussein's counsel to provide "by tomorrow morning" a "small brief" about the "issue [that] came up [earlier] about cross-examination."

The next morning Hussein filed a "bench brief" in which he "request[ed] that the Court either strike Professor Solomon's testimony that Defendants' alleged misrepresentations were 'puffery' . . . or, alternatively, permit Mr. Hussein to

9

cross-examine Professor Solomon on the Ninth Circuit's opinion in the parallel class action proceeding that held the opposite."

The trial court heard argument on the request that morning before Hussein resumed cross-examining Solomon. The court ruled it was "not going to strike Professor Solomon's testimony" in his direct examination and, as to cross-examination, "[w]e're not going to get into the Ninth Circuit [reversal of a demurrer-type early-stage dismissal of a class action against QSI] or go down that path."[4]

b.    *Contentions; Forfeiture; Standard of Review; Our Analysis*

Hussein contends the "puffery" label Solomon attached to Plochocki's "'nothing drying up'" and "'pipeline continues to build'" statements should have been stricken by the trial court because the label amounted to "an improper opinion on a question of law." Specifically, Hussein contends that regardless of how Solomon told the jury he was using the term "puffery," it is a "legal term" and, as such, he suggests Solomon could not use it—only the trial court could declare a statement to be "puffery."

Alternatively, Hussein argues the trial court erroneously denied his motion to strike Solomon's puffery references because, "'even if an expert opinion does not embrace an issue of law, it is not admissible if it invades the province of the jury to decide a case.'"

Hussein forfeited these contentions because they were not the basis on which he asked the trial court to strike Solomon's puffery testimony. In his motion brief, Hussein sought to strike the puffery references "because they are barred by collateral estoppel," and Hussein reiterated that ground at the hearing on his request, contending the Ninth Circuit "looked at these identical statements and said they are not puffery. . . ."

---

[4]    We address Hussein's claim of error regarding denial of his request to cross-examine Solomon about the Ninth Circuit decision in the following section 2.

10

The trial court denied the motion on the proffered ground, questioning whether collateral estoppel applied when it was unclear whether the parties had settled the Ninth Circuit case while a petition for certiorari was "still subject to review" before the United States Supreme Court, thus casting doubt "that it's final or on the merits." More fundamentally, the court also questioned whether a reversal in federal court "of the equivalent of a demurrer in state court" and remand for further proceedings, including discovery and potentially a trial, qualified the Ninth Circuit decision for collateral estoppel effect as "a finding or decision on [the] merits" of the case.

Hussein does not challenge the trial court's denial of his strike motion based on the court's insights regarding collateral estoppel; instead, he asserts new grounds on appeal in which he claims Solomon's testimony amounted to improper expert opinion testimony on a question of law or that it invaded the jury's domain. These new claims are forfeited. Objections first made on appeal are untimely. (Evid. Code, § 353, subd. (a) [objections must be timely and "so stated as to make clear the specific ground"]; *People v. Partida* (2005) 37 Cal.4th 428, 435 ["A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].) Thus, a "defendant forfeit[s] his claim [of error in an evidentiary ruling] by failing to make timely objections or a timely motion to strike *on that specific ground*." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21, italics added; accord, *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564.)

In any event, neither of Hussein's new claims has merit. We review a trial court's ruling on evidentiary matters, including denying a motion to strike testimony, under the abuse of discretion standard. (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1217-1218.)

Hussein contends Solomon's characterization of Plochocki's two statements as puffery "was an improper opinion on a question of law" because, according to Hussein, "'puffery'" is a "legal term" of art. Hussein quotes a definition of puffery in

11

caselaw that refers to it as "'boasts, all-but-meaningless superlatives,' and other such 'claim[s] which no reasonable [person] would take as anything more weighty than a[]. . . slogan.'" (Hussein's brackets; quoting *Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1361.) Hussein also relies on the well-established nonactionable nature of opinion statements: "If [an] assertion . . . is merely a statement of opinion—mere 'puffing'—[a defendant] cannot be held liable for its falsity." (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 111 (*Hauter*).)

Hussein cites the difference between nonactionable opinion statements and "'a statement that is quantifiable, that makes a claim as to . . . "specific or absolute characteristics,"'" which "'may be an actionable statement of fact.'" (*Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 311 (*Demetriades*).) Hussein then argues an expert witness "*cannot* testify that a statement is or is not 'puffery' because characterization as puffery is," solely within the trial court's legal domain. We disagree.

Solomon did not improperly invade the trial court's domain by suggesting to the jury the court should have prevented a trial on Hussein's claims. To the contrary, Plochocki's statements were manifestly actionable in that they were being tried to a jury. Indeed, the purpose of this trial was to allow a jury to decide defendants' liability, if any, for making allegedly false statements that Hussein allegedly relied on.

In any event, moreover, Solomon did not purport to testify regarding the truth or falsity of Plochocki's two statements. QSI called him to testify as an expert witness about how "sophisticated" and/or "activist" investors "*rely* on [different types of] statements." (Italics added.) Solomon gave his opinion regarding the "'nothing drying up'" and "'build[ing] to record levels'" statements: "sophisticated investors, in general, don't rely on those types of statements." He was not asked, and did not render any opinion on, whether the statements were true or false. He expressed no opinion related to credibility.

We likewise find no merit in Hussein's bid for reversal based on Solomon's references to puffery because the context in which he made the references—opining on the likelihood a sophisticated, savvy, and active investor would rely on such statements—did not factor into the jury's verdict:  the jury never reached that issue.  Thus, Hussein fails to establish prejudice from the trial court's decision not to strike Solomon's testimony, given that the jury did not reach the reliance issue on which he testified.  (Evid. Code, § 353, subd. (b) [evidentiary rulings only furnish grounds for reversal if prejudicial to the outcome of the case, resulting in a "miscarriage of justice"].)

The final flaw in Hussein's argument is that he obscures the "'question of law'" on which he claims the trial court erroneously admitted Solomon's testimony.  Specifically, Hussein claims that whether or not a statement is puffery is a question of law for the trial court to resolve, and Solomon's testimony therefore usurped the court's authority to decide questions of law.  Again, we disagree.

Hussein's puffery argument implicates issues of reliance, materiality, and whether the statement is mere opinion.  Thus, a statement rises to the level of "'puffery if the claim is extremely unlikely to induce . . . reliance.'"  (*Demetriades*, *supra*, 228 Cal.App.4th at p. 311.)  Puffery is "related to the materiality of the information" (*Herring v. Teradyne, Inc.* (S.D. Cal., Aug. 29, 2008, No. 01cv1835-DMS) 2008 U.S. Dist. Lexis 128755); the "issue of whether general optimistic statements, sometimes referred to as 'puffery,' may give rise to securities fraud liability is one of materiality" (*Klein v. King* (N.D. Cal., March 26, 1990, No. C-88-3141-FMS) (1990 U.S. Dist. Lexis 5392).  A mere "statement of opinion—mere 'puffing'" engenders no liability.  (*Hauter*, *supra*, 14 Cal.3d at p. 111.)  This comports with the rule that statements "'that amount to "mere puffery" are not actionable because no reasonable consumer relies on puffery.'"  (*Krommenhock v. Post Foods, LLC* (N.D. Cal. 2017) 255 F.Supp.3d 938, 964.)

Whether a statement is immaterial or, in effect, no more than a nonactionable opinion can be decided as a matter of law, but these questions are more

often properly left to the trier of fact. Thus, "'[w]here there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts.'" (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 893.) Similarly, "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'" (*S.E.C. v. Phan* (9th Cir. 2007) 500 F.3d 895, 908.)

That is what happened here. Solomon's testimony did not usurp the trial court's authority on a question of law or invade the jury's province to make factual determinations. Rather, just as Hussein's expert had done, Solomon testified regarding the materiality of Plochocki's alleged misstatements and the likely reliance of investors like Hussein on such statements. Notably, Hussein in a pretrial brief regarding the scope of expert testimony expressly defended his expert's right to testify on these subjects. Hussein stated that opinion testimony "regarding (1) the materiality of the misstatements and omissions at issue for Hussein's claims; and (2) the reasonableness of an investor like Hussein in relying on statements from QSI and its management in making investment decisions . . . *are proper subjects for expert testimony at trial*." (Italics added.)

Solomon's use of the word "puffery" was clearly aimed at these topics. He defined his use of "puffery" as referring to "a vague statement that's sort of promoting something that's not really capable of measurement." The trial court did not err in declining to grant Hussein's demand to strike Solomon's puffery testimony.

2.    *The Trial Court Did Not Err in Restricting Solomon's Cross-Examination*

Hussein contends the trial court erred in denying his request to respond to Solomon's puffery testimony by cross-examining him regarding a Ninth Circuit case involving QSI. "The extent of cross-examination is a matter over which the trial court is given wide discretion, and the only grounds for error are an abuse of that discretion." (*People v. Murray* (1959) 172 Cal.App.2d 219, 232.) The trial court did not abuse its discretion.

14

a. *Background to Hussein's Cross-Examination Claim*

Hussein sought to cross-examine Solomon regarding *In re Quality Systems, Inc. Securities Litigation* (9th Cir. 2017) 865 F.3d 1130 (*Quality Systems*). Solomon had not testified in that case, unlike experts confronted with their prior testimony in the out-of-state cases on which Hussein relies. (See *Murray v. Gray* (Miss. 2021) 322 So.3d 451, 460-462; *Jackson v. Ed's Cab Co.* (La.Ct.App. 1976) 333 So.2d 701, 703.) Nor did Solomon implicitly refer to other cases against QSI in other jurisdictions or deny in his direct examination the existence of other related cases, as in other sister state authority Hussein cites. (*Keefer v. C.R. Bard, Inc.* (1981) 110 Mich.App. 563, 578-580.)

In any event, *Quality Systems* did not involve expert witness testimony because it concerned the federal district court's decision at the pleading stage to dismiss a putative class action "for failure to state a claim." (*Quality Systems*, *supra*, 865 F.3d at p. 1140.) Under the Federal Rules of Civil Procedure, rule 12(b)(6), a dismissal for failure to state a claim is similar to a dismissal in a state trial court after a ruling sustaining a demurrer under California law. That is, the trial court considers the allegations of the complaint, and determines whether the "[f]actual allegations [are] enough to raise a right to relief above the speculative level, [citations] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 555, fn. omitted.) The district court in *Quality Systems* issued a ruling deciding that the plaintiffs' complaint there did not meet that low standard.

The Ninth Circuit reversed that decision and remanded the matter, potentially for trial or other decision on the merits, following discovery. (See *Quality Systems, supra*, 865 F.3d at p. 1135 ["We reverse and remand for further proceedings"].)

It is undisputed that the *Quality Systems* case did not thereafter proceed beyond the pleading stage, nor did Solomon give any testimony in the matter because, as QSI explains, while the Ninth Circuit's decision in *Quality Systems* had been "relisted"

15

by the United States Supreme Court for consideration by the justices for a grant of certiorari, "the case resolved (with no admission of wrongdoing) before the parties took any depositions [or] engaged and disclosed experts."

At the hearing on Hussein's request to strike Solomon's puffery testimony or to cross-examine him on the basis of the Ninth Circuit's *Quality Systems* decision reversing the district court's dismissal, the trial court questioned Hussein's argument that cross-examination was appropriate: "How do you do that without getting *into* the Ninth Circuit case [and the underlying] federal case . . . . How do you get into that without saying, 'Let me tell you who the lead plaintiffs are. Let me tell you that they're sophisticated. Let me tell you that [etc.]'—and suddenly we're litigating [this or] that particular issue." (Italics added.) The trial court then denied the cross-examination request: "We're not going to get into the Ninth Circuit [decision] or go down that path."

b. *Standard of Review; Our Analysis*

The trial court did not err. It rests within the trial court's sound discretion to preclude cross-examination regarding other lawsuits that "would consume too much time and would 'divert[] the jury' from its primary purpose" of deciding the case before it. (*People v. Sapp* (2003) 31 Cal.4th 240, 289; Evid. Code § 352.) Thus, the court may exclude evidence of a related lawsuit because delving into the matter "present[s] a substantial risk of confusing or misleading the jury." (*People v. Hart* (1999) 20 Cal.4th 546, 607.)

These concerns were evident here. For instance, just on the issue of whether the *Quality Systems* lead plaintiffs were sophisticated like Hussein, which was a foundational premise for Solomon's testimony about what such investors rely on, the question of whether their sophistication was meaningfully comparable to Hussein's would require delving into matters not only outside the record here, but outside the record in the *Quality Systems* case. The lead plaintiffs' sophistication had not been developed through discovery there, which had not taken place. Nor was it relevant in that class

16

action. As the trial court sagely intuited, "I don't know how you would get that in . . . ." The trial court could reasonably conclude that embarking on such forays would be distracting and confusing for the jury.

Similarly, the jury would also have to be instructed that the Ninth Circuit reached its conclusion that the contested statements could be found to be material by "'tak[ing] all allegations'" in the complaint there "'as true.'" (*Quality Systems*, *supra*, 865 F.3d at p. 1140.) The trial jurors, in contrast, would have to decide materiality and reliance based on the specific evidence presented to them. Allegations are not always supported by the evidence admitted at trial, and the jury would have to be told to pay attention to the difference. The trial court could reasonably conclude that all of this was too much for too little return, if any. (Evid. Code, § 352.) There was no error in the trial court's ruling.

In any case, there was no possible prejudice. Hussein conceded in the colloquy with the trial court regarding his cross-examination request that "the Ninth Circuit did not make a final decision on the merits of the case. *It was not considering the actual falsity or anything like that*. It was just the sufficiency of the pleadings." (Italics added.) As noted, the jury rendered its verdict based on its conclusion that neither QSI, nor Razin, nor Plochocki "ma[d]e a false representation[] of a fact[]." The jury never reached questions of reliance and materiality—the topics on which Solomon testified. Therefore, cross-examining him on a federal opinion that said nothing about the non-misrepresentation of fact issue the jury found dispositive would not have made a difference in the outcome of the trial. (Evid. Code, § 353.)

3.    *No Instructional Error*

Hussein contends the trial court erred by declining his request to give the jury a special instruction for their deliberations that he crafted based on the *Quality Systems* case. The instruction, which Hussein entitled, "Materiality of Mixed Statements of Fact and Opinion," excerpted—with some omissions—portions of the *Quality Systems*

17

opinion regarding the materiality of statements alleged to be fraudulent.  We find no error.

"Upon request, a party in a civil case is entitled to correct, non-argumentative jury instructions on every theory of the case that is supported by substantial evidence.  [Citations.]  The trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct."  (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)

We independently review contentions that the court erred in instructing the jury.  (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)  An erroneous refusal to instruct the jury is reversible if it is probable "that the error 'prejudicially affected the verdict.'"  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)  There is no error "when the legal point is adequately covered by other instructions."  (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 44.)

As the trial wound down and closing arguments approached, Hussein proposed the following special instruction:  "<u>MATERIALITY OF MIXED STATEMENTS OF FACT AND OPINION</u>  [¶]  General statements of optimism, when taken in context, may form a basis for a fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.  [¶]  Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement.  If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be sufficient."

Following the jury's verdict, Hussein filed a document entitled, in relevant part, "Plaintiff's Notice of Objections to Final Jury Instructions and Verdict Forms."  In

18

the notice, Hussein reiterated his position that the foregoing "Special Instruction No. 3" was necessary "to inform the jury of the Ninth Circuit Court of Appeal's holdings *with respect to the materiality* of the specific alleged misrepresentations at issue in this action." (Italics added.) "This instruction was necessary as a result of the improper and prejudicial testimony of Defendants' expert witness Steven Solomon."

QSI contends Hussein's proposed special instruction was correctly refused because the instruction, like the *Quality Systems* case, pertained to pleading stage standards for claims under federal securities law, and thus was not germane to articulating the standards necessary to prevail on holder's claims under California law. QSI further complains that "Hussein cherry-picked two sentences from different sections of the Ninth Circuit's opinion and left out passages contextualizing that language" to the federal securities claims and safe harbor provisions at issue there.

We need go no further in our analysis than to observe, as we did above, that because the jury did not reach the question of whether the alleged statements or omissions by QSI personnel were material or immaterial to Hussein's investment decisionmaking, there can be no conceivable prejudice in the trial court's decision not to give Hussein's proposed instruction regarding the materiality of alleged statements by QSI personnel. Omitting Hussein's proposed instruction therefore did not prejudice him.

The lack of prejudice from omitting Hussein's proposed special instruction becomes inescapable after considering the instruction the trial court did give and the jury's findings relevant to that instruction.

The trial court instructed the jury with the standard pattern instruction CACI No. 1904 as follows: "*Ordinarily, an opinion is not considered a representation of fact*. An opinion is a person's belief that a fact exists, a statement regarding a future event, or a judgment about quality, value, authenticity, or similar matters. However, Defendants *Plochocki's and QSI's **opinions are** considered **representations of fact** if Mr. Hussein [proves] that*: [¶] Defendant QSI and/or Plochocki claimed to have special

19

knowledge about QSI's financial information that Mr. Hussein did not have.  Or,  [¶] Defendant QSI and/or Plochocki had a relationship of trust and confidence with Mr. Hussein.  Or,  [¶]  *QSI and/or **Plochocki had*** some other special ***reason to expect that Mr. Hussein would rely on*** *the defendant's opinion*.  (Italics and boldface added.)

The jury in its verdict regarding constructive fraud concluded Plochocki "kn[e]w, or should . . . have known, that Mr. Hussein *would rely upon* [his] statements regarding QSI's financial performance or projections."  (Italics added.)

That expectation of reliance meant the jury under CACI No. 1904 treated Plochocki's opinions "regarding QSI's financial performance or projections" as *facts*. (*Housley v. Godinez* (1992) 4 Cal.App.4th 737, 747 ["We must presume that the jury understood and followed the instructions given"].)  In other words, regardless of parsing Plochocki's statements into "general statements of optimism" or "specific aspects of a company's operation" or "non-forward-looking statements" or "forward-looking" ones as Hussein would have had the jury do under his special instruction, the jurors treated everything Plochocki said—whether in the form of an opinion or otherwise—as "representations of fact" under CACI No. 1904 because he knew, or should have known, Hussein would rely on those statements.  The jury nevertheless expressly found that Plochocki, in making the contested statements, did not "mislead Mr. Hussein . . . or provid[e] Mr. Hussein with information that was materially inaccurate or incomplete."

Hussein's instructional challenge fails because he fails to demonstrate any prejudice when the jury's verdict gave him more than he asked for in his proposed instruction.

20

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.